**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Michael More,

               Plaintiff,

v.

Charles L. Ryan, et al.,

               Defendants.

No.   CV 18-00626-PHX-DGC (CDB)

**ORDER**

Plaintiff Michael More, currently confined in the Arizona State Prison Complex (ASPC)-Lewis, Bachman Unit in Buckeye, Arizona, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983.  The following motions are before the Court: (1) Defendant Coleman's Motion for Summary Judgment (Doc. 95); (2) Plaintiff's Motion for Summary Judgment (Doc. 104); (3) Defendants Corizon, Ende, Grabowski, Labar, Myers, Rogers, and Elijah's ("Corizon Defendants") Motion for Summary Judgment (Doc. 111);[1] (4) Plaintiff's Motion for Preliminary Injunction (Doc. 114); and (5) Plaintiff's Motion to Amend (Doc. 132).[2]

## I.    Background

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response.  (Docs. 97, 113.)

[2] The Court will deny Plaintiff's request to file an Amended Motion for Summary Judgment (Doc. 132.)   Plaintiff's motion comes over a month after his Motion for Summary Judgment was fully briefed and nearly three months after the dispositive motion deadline expired.  (*See* Doc. 103 (setting a dispositive motion deadline of May 27, 2019).)  Further, the Court has reviewed Plaintiff's lodged proposed amended statement of facts (Doc. 134) and they are identical to his original Statement of Facts (Doc. 105.)

In his First Amended Complaint, Plaintiff alleges that between 2016 and 2018, various prison officials and members of the prison medical staff violated his Eighth Amendment right to medical care when they failed to treat his chest pains, refused to replace his automatic implantable cardioverter-defibrillator (AICD), and ignored his need for chronic cardiology care.  (Doc. 12.)  On screening pursuant to 28 U.S.C. § 1915A(a), the Court found that Plaintiff stated Eighth Amendment medical claims against Defendants Corizon Health Services, Nurse Practitioner (NP) Ende, Facility Health Administrator (FHA) Rogers, Assistant FHA Labar, Deputy Warden Coleman, Medical Records Supervisor Grabowski, Registered Nurse (RN) Myers, Dr. Elijah, and Dr. Barnett and directed them to answer.  (Doc. 15.)  The Court dismissed the remaining claims and Defendants.  (*Id.*)

## II.     Legal Standards

### A.     Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## B. Medical Care Claim

Under the Eighth Amendment, a prisoner must demonstrate that a defendant acted with "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective prong and a subjective prong. First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Examples of a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. A prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; to satisfy the knowledge component, the official must both be aware of facts from which the

inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096.

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. California Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

Finally, even if deliberate indifference is shown, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

**III. Plaintiff's Medical History and Treatment**

Plaintiff arrived at ASPC-Eyman on April 18, 2016. (Doc. 112 (Corizon Defs.'s Statement of Facts) ¶ 1.) The following day, Plaintiff had a chronic care visit with provider Stephen Graham. (*Id.* ¶ 2.) Graham noted that Plaintiff's blood pressure was too elevated given Plaintiff's chronic heart condition, so he ordered Candesartan Cilexetil (Atacand) to treat Plaintiff's high blood pressure and submitted a request for an offsite cardiology appointment. (*Id.*)

On May 25, 2016, Plaintiff had an offsite cardiology appointment with Dr. Shanta Kumar at Goldfield Cardiovascular Institute. (*Id.* ¶ 3.) Dr. Kumar assessed Plaintiff with hypertension and congestive heart failure. (Doc. 112 at 27 (Corizon Defs.' Ex. C).) Plaintiff reported that he was "feeling great without any chest pain or shortness of breath," and Dr. Kumar noted that Plaintiff was "totally asymptomatic." (*Id.*)

On July 20, 2016, Plaintiff had a follow-up appointment with Dr. Kumar and reported that he "does [a] lot of exercise in the correctional facility." (Doc. 100 at 103 (Pl.'s Ex. A); Doc. 105 at 8 (Pl.'s Ex. 2).) Dr. Kumar noted that Plaintiff was "totally asymptomatic," his AICD was working "very well," "[t]he battery life appears to be good for another four years," and Plaintiff's echocardiogram indicated that his ejection fraction had improved to 55-60% which Dr. Kumar described as "almost normal at this point." (*Id.*) Dr. Kumar recommended that Plaintiff return in six months for a "pacer check." (*Id.*)

On November 14, 2016, Plaintiff had an onsite appointment with Defendant Dr. Barnett. (Doc. 112 ¶ 5.) Defendant Barnett noted that Plaintiff "occasionally misses doses of carvedilol, but takes most of the time." (*Id.* at 35 (Corizon Defs.' Ex. E).) Plaintiff contends that he "has never . . . refused to take his medications." (Doc. 116 (Pl.'s Statement of Facts) ¶¶ 5–6.) Defendant Barnett advised Plaintiff to continue his medication. (Doc. 112 ¶ 5.) Defendant Barnett saw Plaintiff again the following day for a chronic care appointment. (*Id.* ¶ 6.) Defendant Barnett noted Plaintiff's history of high blood pressure and chronic heart failure. (*Id.* at 39 (Corizon Defs.' Ex. F).) Plaintiff reported that he felt "great" when discussing his heart condition. (*Id.*) At the time, Plaintiff had prescriptions for Ibuprofen, Aspirin, Candesartan Cilexetil, and Carvedilol (high blood pressure/heart failure). (*Id.* at 43–44.) Defendant Barnett ordered an EKG. (*Id.* at 45.)

On May 11, 2017, Plaintiff had an onsite chronic care appointment with Defendant Dr. Elijah. (*Id.* ¶ 7.) Plaintiff reported intermittent chest pain. (*Id.* at 48 (Corizon Defs.' Ex. G).) Dr. Elijah noted that Plaintiff's AICD had been placed in 2009 and that it was currently "in place to left upper chest, incision well healed at insertion site." (*Id.* at 48–49.) He also noted that Plaintiff was due for a cardiology follow-up to check his AICD.

(*Id.* at 54.)  Dr. Elijah ordered that Plaintiff "continue off candesartan for now" and try to lose 10-20 pounds.  (*Id.*)[3]  Dr. Elijah also recommended monthly blood pressure checks for three months.  (*Id.*)  Plaintiff's Naproxen (anti-inflammatory), Carvedilol, and Aspirin were renewed in May 2017.  (*Id.* at 60 (Corizon Defs.' Ex. H).)

On August 21, 2017, Plaintiff submitted a Health Needs Request (HNR) requesting an appointment to see a cardiologist for his chronic heart condition.  (Doc. 96 (Coleman Statement of Facts) ¶ 1.)  The following day, Defendant RN Myers entered a Health Service Request referring Plaintiff's complaint to the provider for review.  (Doc. 112 at 57 (Corizon Defs.' Ex. H).)  Plaintiff's Paroxetine (anti-depressant) was renewed on August 23, 2017.  (*Id.* at 60.)  On August 31, 2017, Plaintiff was seen by Defendant NP Ende.  (*Id.* ¶ 8.)  Defendant Ende ordered several lab tests, a chest x-ray, and a cardiology consult.  (*Id.* at 61.)  Plaintiff's Candesartan Cilexetil was renewed on September 2, 2017.  (Doc. 112 at 77 (Corizon Defs.' Ex. K).)

On October 2, 2017, Plaintiff had an appointment at Integrated Medical Services (IMS) Cardiology.  (Doc. 96 ¶ 2.)  During this appointment, Plaintiff's AICD was examined, and it was noted that the voltage was "too low for projected remaining capacity" and that the battery had been depleted on September 6, 2017.  (*Id.*; Doc. 96-1 at 4–6.)  A chest x-ray was recommended to evaluate Plaintiff's AICD for a possible lead fracture.  (Doc. 105 at 10 (Pl.'s Ex. 4).)  On October 12 and 13, 2017, Plaintiff submitted HNRs complaining that he was having "regular chest pains," that his "AICD is not working," and requesting to have an echocardiogram.  (Doc. 96 ¶ 3; Doc. 96-1 at 8; Doc. 105 at 14–15 (Pl.'s Exs. 5, 6).)  On October 14, 2017, Defendant Ende requested an urgent cardiology consult for Plaintiff.  (Doc. 112 at 69–73 (Corizon Defs.' Ex. J).)

On October 16, 2017, Plaintiff submitted an Inmate Letter to Defendant Coleman stating that he needed to see a cardiologist to have his AICD replaced.  (Doc. 96 ¶ 4.)  Defendant Coleman asserts that after receiving Plaintiff's letter, he visited Plaintiff at his

---

[3] Plaintiff's Candesartan Cilexetil prescription expired on December 4, 2016.  (Doc. 112 at 44.)

cell and told Plaintiff that he would speak to the medical staff on Plaintiff's behalf to get Plaintiff seen by a provider.  (*Id.* ¶ 5.)  When Defendant Coleman spoke to the medical staff, he was informed that Plaintiff did not need a new AICD, and Defendant Coleman relayed this information to Plaintiff.  (*Id.* ¶ 5.)  Defendant Coleman is not a medical provider and does not have any medical training.  (*Id.* ¶ 15.)  Defendant Coleman is not involved in making treatment decisions.  (*Id.* ¶ 14.)

On October 18, 2017, Plaintiff was seen by Defendant Ende at sick call.  (Doc. 112 ¶ 11.)  Defendant Ende noted that there was a questionable reading on Plaintiff's AICD and there was no battery life left; he also noted that a cardiology consult request had already been submitted.  (*Id.* at 75–76 (Corizon Defs.' Ex. K).)

On October 24, 2017, Plaintiff was seen by onsite provider Dr. Paul, and the plan notes stated the following:

> [C]all placed to IMS . . . case [discussed with] Dr. Battacharya. Reports that battery will need to be replaced.  Informed of [Plaintiff's complaints of] chest pain however he feels that the chest pain is not related to the AICD.  Would like follow up with [Plaintiff] to evaluate chest pain perhaps obtain an echo and/or stress test.  [Plaintiff was] informed of conversation with Dr. Battacharya and that consult for follow up with cardiology is scheduled however date is pending.

(Doc. 100 at 122 (Pl.'s Ex. 30).)  Chest x-rays were ordered "to check for lead fracture." (*Id.*)  On October 27, 2017, Plaintiff's prescriptions for Carvedilol, Aspirin, and Naproxen were renewed.  (Doc. 112 at 95 (Corizon Defs.' Ex. N).)

On October 30, 2017, Plaintiff submitted grievance number L34-020-017 to Defendant Rogers complaining that he was not receiving adequate treatment for his chest pain and that his AICD had not been replaced.  (Doc. 100 at 118 (Pl.'s Ex. 9).)  That same day, Plaintiff was seen offsite at IMS Cardiology by Dr. Adhar Seth.  (Doc. 96 ¶ 8.)  The examination report indicated that Plaintiff had prescriptions for Aspirin, Atacand, Carvedilol, Naproxen, and Paroxetine.  (Doc. 96-1 at 17.)  Dr. Seth noted "[AICD] battery depleted.  Let[']s see what his EF [ejection fraction] is and we may need to have EP

[electrophysiologist] see him to have generator change." (*Id.* at 18.)  Dr. Seth recommended for Plaintiff to continue his medications and to follow up "after echo or sooner if needed." (*Id.*)

On November 3, 2017, Defendant Coleman followed up with Plaintiff to confirm that he had been seen onsite by the medical staff.  (Doc. 96 ¶ 9.)  On November 7, 2017, Plaintiff saw Defendant Myers at sick call and requested to "see psych immediately" because he was experiencing panic attacks, mood swings, and nightmares due to his pacemaker not working.  Defendant Myers referred Plaintiff to the mental health staff that same day.  (Doc. 112 at 92–93, 97 (Corizon Defs.' Ex. N).)

Plaintiff had a chronic care appointment with Defendant Ende on November 10, 2017.  (Doc. 112 at 101–08 (Corizon Defs.' Ex. O).)  Defendant Ende reviewed the October 30, 2017 cardiology report and noted "echo recommended, addressed pacer battery depleted." (*Id.* at 103.)  Plaintiff was scheduled for weekly blood pressure checks for three weeks and a follow-up with the provider.  (*Id.* at 107–08.)  On November 11, 2017, Defendant Ende submitted a cardiology consult request for Plaintiff.  (*Id.* at 112.)  Plaintiff's Paroxetine was renewed on November 15, 2017.  (*Id.* at 120 (Corizon Defs.' Ex. Q).)

On November 27, 2017, Defendant Grabowski responded to Plaintiff's October 16, 2017 letter and noted that Plaintiff was seen by a cardiologist on October 30, 2017 and had an onsite follow-up with the provider on November 10, 2017.  (*Id.* ¶ 10.)  On November 29, 2017, Defendant Rogers responded to grievance number L34-020-017 and stated, "[a]fter a review of your medical record, it was discovered that the provider has been sending you to the cardiologist.  You were just seen as recent as 10-2-17 & 10-30-17." (Doc. 100 at 119 (Pl.'s Ex. 12).)

On December 1, 2017, Plaintiff had an echocardiogram at IMS Cardiology.  (Doc. 112 ¶ 11.)  The results indicated the following:

> 1.     Left ventricular ejection fraction was mildly reduced, estimated in the range of 45 to 50%.  The left ventricle is thickened in a fashion consistent with mild concentric

hypertrophy. Grade I diastolic dysfunction, consistent with impair [left ventricle] relaxation and normal LAP [left atrial pressure].

2.     Valve Structures not well visualized, grossly normal.

3.     There is no pericardial effusion.

(Doc. 96-1 at 22.) Plaintiff was seen onsite by RN Uriarte the following day to have his blood pressure checked. (Doc. 112 at 118–22 (Corizon Defs.' Ex. Q).) RN Uriarte noted that Plaintiff's diastolic blood pressure was slightly elevated and that Plaintiff "walked in on own power, no acute distress noted . . . gait steady, ambulated with no difficulties . . . speech clear, able to verbalize needs, respirations even and unlabored." (*Id.* at 118–19.) RN Uriarte advised Plaintiff "to contact medical for any type of chest pains or [signs or symptoms] that he requires defibrillation[.]" (*Id.* at 121.)

On December 29, 2017, Plaintiff saw Defendant Ende onsite; Defendant Ende reviewed Plaintiff's echocardiogram results and submitted a cardiology consult request. (*Id.* at 124, 127 (Corizon Defs.' Ex. R).) On January 11, 2018, Plaintiff was prescribed Losartan for high blood pressure. (*Id.* at 137 (Corizon Defs.' Ex. T).)

On January 22, 2018, Plaintiff had another echocardiogram at IMS Cardiology with Dr. Hursh Naik, and the results showed that his ejection fraction was 45%. (*Id.* ¶ 12.) Dr. Naik noted that Plaintiff "denies chest pain at rest, denies exertional chest pain, denies dyspnea, denies fatigue, denies exercise intolerance and denies palpitations." (*Id.*) Dr. Naik recommended that Plaintiff be referred to "EP for generator changes," have a follow-up echocardiogram in six months, and continue on his medications. (*Id.*; Doc. 96-1 at 26.) At the time, Plaintiff had prescriptions for Aspirin, Atacand, Carvedilol, Naproxen, and Paroxetine. (Doc. 96-1 at 25.)

On January 28, 2018, Plaintiff submitted an HNR complaining that he had not received his new medication that was prescribed at his January 22, 2018 cardiology appointment. (Doc. 112 at 133 (Corizon Defs.' Ex. T).) On January 30, 2018, NP Smith submitted an EP consult request as recommended by Dr. Naik. (Doc. 112 ¶ 20.) On February 1, 2018, NP Smith ordered Aldactone (Spironolactone) as recommended by Dr.

Naik to treat Plaintiff's high blood pressure. (*Id.*) On February 12, 2018, Plaintiff submitted an HNR inquiring about getting his AICD replaced, and he was advised that he was scheduled to see the cardiologist. (*Id.* ¶ 21.)

On February 16, 2018, Plaintiff had an EP evaluation at the AZ Heart Rhythm Center with Dr. Akash Makkar. (Doc. 100 at 123–27 (Pl.'s Ex. 36).) Dr. Makkar noted that Plaintiff's AICD was "at ERI [elective replacement indicator]." (*Id.* at 126.) Dr. Makkar recommended that Plaintiff "undergo generator change." (*Id.*) Dr. Makkar also recommended a "healthy heart diet low in sodium, high in fresh fruit intake" and that Plaintiff "return every 3 months for AICD check and management." (*Id.*) Dr. Makkar referred Plaintiff "to Dr. Naik for serial echocardiography." (*Id.*) At this time, Plaintiff had prescriptions for Aspirin, Atacand, Coreg (Carvedilol), Lasix (fluid retention), Naproxen, and Paxil (Paroxetine). (Doc. 105 at 27 (Pl.'s Ex. 14).) On February 24, 2018, Defendant Ende reviewed Plaintiff's medical records and submitted a cardiology consult request. (Doc. 112 ¶ 23). That same day, Plaintiff was prescribed Furosemide to treat swelling related to his heart condition. (Doc. 112 at 164 (Corizon Defs.' Ex. X).)

On March 12, 2018, Plaintiff's AICD battery was replaced at Abrazo Arizona Heart Hospital by Dr. Makkar. (Doc. 96 ¶ 13; Doc. 112 at 159–60 (Corizon Defs.' Ex. X).) No complications were noted. (Doc. 112 at 159.) That same day, Plaintiff was seen onsite by NP Johnson who noted that Plaintiff's incision site "ha[d] scant amount of drainage, but [was] otherwise intact." (*Id.* at 163.) NP Johnson noted that Plaintiff's dressing should be removed in 5-7 days and submitted a consult request for Plaintiff to follow-up at AZ Heart Rhythm Center in 10-14 days. (*Id.* at 166.) NP Johnson entered the following Special Needs Orders: no lifting, pushing, pulling, or running; no reaching above shoulder height; limited mobility; and pacemaker/defibrillator. (*Id.*) She also advised Plaintiff not to remove his bandages on his own, not to use any lotions or ointments, and to "notify medical if shock felt, sudden weight gain, edema in legs/feet, increased [shortness of breath], lightheadedness, nausea, vomiting, rash, increased warmth or redness, increased pain,

swelling or fluid leaking from incision." (*Id.*) Plaintiff was prescribed Codeine for pain and Doxycycline to prevent infection. (*Id.* at 173 (Corizon Defs.' Ex. Y).)

On March 14, 2018, an Incident Command System (ICS) was called after Plaintiff reported chest pain. (*Id.* ¶ 25.) RN Marshall examined Plaintiff and noted that an EKG was performed and showed "no new changes from prior EKG's, no [signs or symptoms] of cardiac distress." (*Id.* at 170 (Corizon Defs.' Ex. Y).) RN Marshall also noted that Plaintiff's incision site was "red with some swelling, no drainage or bleeding, no [signs or symptoms] of infections." (*Id.*) NP Johnson ordered medical ice for three days, Ibuprofen, and Toradol to treat Plaintiff's pain and scheduled Plaintiff for a follow-up nurse call for the following day. (*Id.* at 175.)

On March 15, 2018, Plaintiff was seen onsite by RN Boyce. (*Id.* ¶ 26.) Plaintiff denied having any pain. (*Id.*) RN Boyce changed Plaintiff's bandages and did not observe any redness or signs of infection at the incision site. (*Id.*) On March 17, 2018, RN Boyce changed Plaintiff's bandages again and noted that the incision site was clean, dry, and intact with no signs or symptoms of infection. (*Id.*)

On March 30, 2018, Plaintiff had a follow-up appointment at AZ Heart Rhythm Center with Dr. Vijendra Swarup. (*Id.* ¶ 27.) Plaintiff denied chest pain, palpitations, shortness of breath, dizziness, fever, night sweats, significant weight gain or loss, vomiting, coughing, or any other complications. (Doc. 112 at 192 (Corizon Defs.' Ex. AA).) Dr. Swarup tested the new AICD, and it was functioning normally. (*Id.*) Dr. Swarup recommended that Plaintiff return every three months for an AICD check. (*Id.* at 193.)

On May 24, 2018, Plaintiff had an onsite chronic care visit with NP Ndemanu. (*Id.* ¶ 29.) Plaintiff denied having chest pain, difficulty breathing, palpitations, or any other heart-related symptoms. (*Id.* at 206 (Corizon Defs.' Ex. CC).) NP Ndemanu noted that Plaintiff's heart rate and rhythm were regular. (*Id.* at 208.) At this time, Plaintiff had active prescriptions for Furosemide, Carvedilol, Aspirin, Paroxetine, Naproxen, Spironolactone, and Losartan. (*Id.* at 211–12.)

On June 28, 2018, NP Ndemanu submitted a cardiology consult request for Plaintiff's three-month follow-up visit. (*Id.* ¶ 30.) On July 13, 2018, Plaintiff went to AZ Heart Rhythm Center for his follow-up appointment with Dr. Makkar. (*Id.*) Plaintiff denied having chest pain or any other symptoms, and Dr. Makkar observed that Plaintiff's AICD was functioning normally. (*Id.* at 223 (Corizon Defs.' Ex. DD).) Dr. Makkar noted that Plaintiff was "stable from an EP standpoint" and recommended that Plaintiff continue on his current medications and follow-up in six months. (*Id.* at 224.)

Plaintiff's Losartan and Paroxetine were renewed in July 2018, and his Spironolactone was renewed in August 2018. (*Id.* at 231 (Corizon Defs.' Ex. EE).) On October 2, 2018, Plaintiff saw onsite provider NP Klein for a chronic care appointment during which Plaintiff denied chest pain, shortness of breath, or dizziness. (*Id.* at 226.) NP Klein noted that Plaintiff's heart rate and rhythm were regular. (*Id.* at 228.) NP Klein made a note that Plaintiff was due for a cardiology follow-up in December 2018. (*Id.* at 233.)

Plaintiff had a chronic care appointment with NP DeMello on January 24, 2019. (*Id.* ¶ 32.) Plaintiff reported that he had stopped taking his Losartan based on the "news of its [sic] bad" and that "the idiots here at Corizon don't know what they are talking about and just throw labels that are not correct. I don't think I need to be on it anyways [sic]." (*Id.* at 236 (Corizon Defs.' Ex. FF).) NP DeMello reviewed Plaintiff's January 18, 2019 lab results and advised Plaintiff to take his medications as prescribed. (*Id.* at 240.) NP DeMello changed Plaintiff's medication to "watch swallow" status and ordered blood pressure checks three times per week for three weeks. (*Id.*)

On February 15, 2019, an ICS was called when Plaintiff reported that he woke up with chest pain. (*Id.* ¶ 33.) Plaintiff stated that he had taken a lot of Ibuprofen the day before for ongoing tooth pain. (*Id.*) An EKG was performed by the night shift and transferred to the day shift nurse for review. (*Id.*) That same day, Plaintiff had another EKG, and RN Hoffman examined Plaintiff and noted that his "respirations [were] equal and unlabored" and his heart rate and rhythm were regular. (*Id.* at 254, 257 (Corizon Defs.'

Ex. GG).)  Plaintiff was informed of the potential consequences of taking too many non-steroidal anti-inflammatories, such as Ibuprofen, and was advised to take his medication as prescribed.  (*Id.* at 257.)

On March 21, 2019, Plaintiff had a chronic care appointment with NP DeMello.  (*Id.* ¶ 34.)  Plaintiff denied chest pain, shortness of breath, headache, or dizziness.  (*Id.* at 260 (Corizon Defs.' Ex. HH).)  NP DeMello noted that Plaintiff's heart rate and rhythm were regular with no murmur present.  (*Id.* at 261.)  At the time, Plaintiff had active prescriptions for Spironolactone, Furosemide, Carvedilol, Aspirin, and Naproxen.  (*Id.* at 265–66.)

## IV. Deliberate Indifference Analysis

### A. Serious Medical Need

The parties do not dispute that Plaintiff's heart condition constitutes a serious medical need; and the evidence of Plaintiff's medical treatment—which included diagnostic testing, specialist visits, having his AICD battery replaced, and being prescribed several medications to manage his blood pressure and chest pain—supports a finding that Plaintiff's condition was "worthy of comment or treatment" so as to constitute a serious medical need.  *McGuckin*, 974 F.2d at 1059-60.  Accordingly, the objective prong of the deliberate indifference analysis has been satisfied, and the Court must consider whether the response to Plaintiff's serious medical need amounted to deliberate indifference.

### B. Deliberate Indifference

#### 1. Defendants Rogers, Labar, Grabowski, and Coleman

Plaintiff's claims against Defendants Rogers, Labar, Grabowski, and Coleman arise from their responses to his administrative grievances.  (*See* Doc. 12 at 6–9.)  The record does not support a finding that their responses to Plaintiff's grievances amounted to deliberate indifference.

Upon receiving Plaintiff's October 16, 2017 Inmate Letter requesting to be taken to the cardiologist to have his AICD replaced, Defendant Coleman spoke to the medical staff on Plaintiff's behalf, and when they informed him that Plaintiff did not need a new AICD, Defendant Coleman relayed this information to Plaintiff.  (Doc. 96 ¶¶ 4–5.)  On November

3, 2017, Defendant Coleman followed up with Plaintiff to confirm that he had been seen onsite by the medical provider. (*Id.* ¶ 9.) By that time, Plaintiff had been seen twice by onsite providers and attended an offsite cardiology appointment at IMS Cardiology. (Doc. 112 ¶ 11; Doc. 100 at 122; Doc. 96 ¶ 8.) This was the extent of Defendant Coleman's involvement in Plaintiff's medical treatment. Defendant Coleman is not a medical provider, he does not have any medical training, and he is not involved in making treatment decisions. (*Id.* ¶¶ 14–15.) His reliance on the medical staff's professional judgment regarding Plaintiff's AICD was not unreasonable. Further, Plaintiff was not harmed by Defendant Coleman's conduct because Plaintiff was seen by cardiologist Dr. Seth at IMS Cardiology on October 30, 2017, two weeks after he submitted the Inmate Letter to Defendant Coleman, and Dr. Seth referred Plaintiff to the EP to have Plaintiff evaluated for an AICD battery replacement. (Doc. 96-1 at 18.) On these facts, Defendant Coleman's response to Plaintiff's Inmate Letter did not amount to deliberate indifference, and he will be dismissed from the action.

Defendants Grabowski and Rogers' responses to Plaintiff's medical grievances did not amount to deliberate indifference. On November 27, 2017, Defendant Grabowski responded to Plaintiff's October 16, 2017 Inmate Letter and noted that Plaintiff was seen by a cardiologist on October 30, 2017 and had an onsite follow-up with the provider on November 10, 2017. (Doc. 112 ¶ 10.) Grievance L34-020-017 was received by the medical unit on November 15, 2017, and on November 29, 2017, Defendant Rogers responded that "[a]fter a review of your medical record, it was discovered that the provider has been sending you to the cardiologist. You were just seen as recent as 10-2-17 & 10-30-17." (Doc. 100 at 119.) Simply stated, Plaintiff requested to be seen by a cardiologist to have his AICD replaced, and Defendants Grabowski and Rogers responded that he had already been seen by the cardiologist twice the previous month. Defendants Grabowski and Rogers' limited involvement in Plaintiff's medical treatment did not rise to the level of deliberate indifference. Their responses to Plaintiff's grievances were based on the documentation in his medical records. Defendants Grabowski and Rogers are not

physicians or medical providers, and there is no evidence that they were qualified or authorized to make clinical decisions. (*See* Doc. 112 at 271, 275.) Further, there is no evidence that Plaintiff was harmed by their conduct where Plaintiff was taken to IMS Cardiology on December 1, 2017 to undergo an echocardiogram, less than a week after Defendants Grabowski and Rogers' responses. Accordingly, Defendants Grabowski and Rogers will be dismissed from the action as well.

Finally, in his First Amended Complaint, Plaintiff alleges that Defendant Labar responded to his informal grievances dated October 6 and October 29, 2017 and stated that Plaintiff was "being followed by cardiology," but Defendant Labar failed to "mention [Plaintiff's] need of echocardiogram or AICD replacement." (Doc. 12 at 7.) The October 6 and 29 informal grievances and Defendant Labar's responses were not provided in the record, and Plaintiff does not state what he said in the informal grievances. Given this lack of evidence, Plaintiff has failed to create a genuine issue of fact as to whether Defendant Labar's responses amounted to deliberate indifference. Defendant Labar is not a medical provider, and there is no evidence that she was authorized to make clinical decisions or prescribe courses of treatment. (Doc. 112 at 273.) Further, the medical evidence shows that Plaintiff was taken to IMS Cardiology on October 2, 2017, four days before he submitted the first informal grievance to Defendant Labar, and again on October 30, 2017, the day after he submitted the second informal grievance to Defendant Labar. (Doc. 96 ¶¶ 2, 8.) Plaintiff's AICD was examined during both of these appointments, and the treating specialists recommended that Plaintiff undergo additional testing—including a chest x-ray and an echocardiogram—before having his AICD battery replaced. (Doc. 96-1 at 18; Doc. 105 at 10.) There is no evidence that Plaintiff was harmed by Defendant Labar's responses to his informal grievances, and his claim against Defendant Labar must also be dismissed.

For the foregoing reasons, summary judgment will be granted to Defendants Coleman, Grabowski, Rogers, and Labar, and they will be dismissed from the action.

## 2. Defendant Ende

The Court will also grant summary judgment in favor of Defendant Ende. The

undisputed record shows that when Plaintiff submitted an HNR on August 21, 2017 requesting to see a cardiologist, Defendant Ende submitted a cardiology consult request on August 31, 2017, in addition to ordering several lab tests and a chest x-ray. (Doc. 112 at 61.) Similarly, when Plaintiff submitted HNRs on October 12 and 13, 2017 complaining that he was having chest pains, his AICD was not working, and requesting to have an echocardiogram, Defendant Ende submitted an urgent cardiology consult request on October 14, 2017. (Doc. 96 ¶ 3; Doc. 96-1 at 8; Doc. 105 at 14–15; Doc. 112 at 69–73.) At Plaintiff's November 10, 2017 chronic care appointment, Defendant Ende scheduled Plaintiff for weekly blood pressure checks, and submitted another cardiology consult request the following day. (Doc. 112 at 107–08, 112.) Defendant Ende saw Plaintiff again on December 29, 2017, and after reviewing Plaintiff's most recent echocardiogram results, he submitted a cardiology consult request. (Doc. 112 at 124, 127.) Defendant Ende reviewed Plaintiff's medical records on February 24, 2018 and submitted another consult request for Plaintiff to be seen by the cardiologist. (Doc. 112 ¶ 23.) On these facts, Defendant Ende's responses to Plaintiff's medical complaints did not amount to deliberate indifference. Plaintiff asserts that "[o]n October 24, 2017 Lawrence Ende N.P. sent Plaintiff for an x-ray of his chest," and, according to Plaintiff, "x-ray is not a culpable [sic] test for heart functionality." (Doc. 12 at 7.) The evidence indicates, however, that the chest x-rays were recommended by the specialist from IMS Cardiology in order to evaluate Plaintiff's AICD for a possible lead fracture. (Doc. 105 at 10.) Plaintiff has failed to refute Defendants' evidence that the treatment he received from Defendant Ende was medically appropriate. Plaintiff's claim against Defendant Ende will be dismissed.

### 3.    Defendant Myers

Defendant Myers' only involvement in Plaintiff's medical treatment was referring Plaintiff's August 21, 2017 HNR to the provider for review on August 22, 2017 and referring Plaintiff to the mental health staff on November 7, 2017 when he asked to "see psych immediately." (Doc. 112 at 57, 92, 97.) Defendant Myers did not deliberately disregard Plaintiff's serious medical needs. The evidence shows that she promptly

responded to Plaintiff's HNRs, and her actions resulted in Plaintiff receiving the medical care he requested. Defendant Myers will be dismissed from the action.

#### 4. Defendant Elijah

Plaintiff had an onsite chronic care appointment with Dr. Elijah on May 11, 2017. (Doc. 112 at 48.) Plaintiff's heart rate and rhythm were regular. (*Id.* at 50.) In response to Plaintiff's complaint of intermittent chest pain, Defendant Elijah ordered monthly blood pressure checks and advised Plaintiff to lose weight. (*Id.* at 50.) Defendant Elijah also noted that Plaintiff was due for a cardiology follow-up and AICD check. (*Id.* at 54.) These facts do not show that Defendant Elijah deliberately disregarded Plaintiff's heart condition. And even if Defendant Elijah's failure to submit a cardiology consult request could be viewed as deliberate indifference, the evidence does not show that Plaintiff was harmed by the delay in being seen by the cardiologist where specialist Dr. Battacharya opined in October 2017 that he did not think that Plaintiff's chest pain was related to the AICD and there are no facts connecting Plaintiff's chest pain to his AICD battery being depleted. (Doc. 100 at 122.)

In his First Amended Complaint, Plaintiff alleges that in March 2017, Defendant Elijah "dismissed [his] chest pains and labored breathing" and "denied chronic cardio care." (Doc. 12 at 5.) There are no records of Plaintiff being seen by Defendant Elijah in March 2017, so it is not clear whether Plaintiff was actually referring to the May 22, 2017 appointment with Dr. Elijah. Even assuming Plaintiff was seen by Defendant Elijah in March 2017, absent additional facts regarding the encounter, Plaintiff's conclusory statements in his First Amended Complaint are too vague to support a deliberate indifference claim. Plaintiff's claim against Defendant Elijah will be dismissed.

#### 5. Corizon

To prevail on a claim against Corizon as a private entity serving a traditional public function, Plaintiff must meet the test articulated in *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 690-94 (1978). *See also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities acting under color of

state law).  Accordingly, Plaintiff must show that an official policy or custom caused the constitutional violation.  *Monell*, 436 U.S. at 694.  To make this showing, he must demonstrate that: (1) he was deprived of a constitutional right; (2) Corizon had a policy or custom; (3) the policy or custom amounted to deliberate indifference to Plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation.  *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

Defendants have presented ample evidence that Plaintiff's chest pains and heart-related symptoms were consistently addressed by the medical staff, and he was prescribed several medications to alleviate these symptoms.  Plaintiff had several cardiology appointments and his condition was monitored through EKGs and echocardiograms.

To the extent Plaintiff contends that the failure to replace his AICD battery as soon as it was discovered to be depleted amounted to deliberate indifference, his argument fails.  During Plaintiff's October 2, 2017 appointment at IMS Cardiology, it was noted that the battery in Plaintiff's AICD was depleted on September 6, 2017.  (Doc. 96-1 at 4–6.)  But the specialist did not recommend a battery replacement at this time.  Instead, the specialist recommended a chest x-ray to evaluate Plaintiff's AICD for a possible lead fracture.  (Doc. 105 at 10.)  The Corizon medical staff followed this recommendation, and chest x-rays were ordered on October 24, 2017.  (Doc. 100 at 122.)

Plaintiff returned to IMS Cardiology on October 30, 2017, where Dr. Seth noted that Plaintiff's AICD battery was depleted.  (Doc. 96-1 at 17–18.)  Again, Dr. Seth, the treating specialist, did not recommend that the battery be replaced.  He recommended that Plaintiff have an echocardiogram to check his ejection fraction before seeing the EP about a battery change.  (*Id.*)  Plaintiff underwent echocardiograms at IMS Cardiology on December 1, 2017 and January 22, 2018.  (Doc. 112 ¶¶ 11–12.)  At the January 22, 2018 appointment, Dr. Naik recommended that Plaintiff be referred for an EP appointment to be evaluated for a battery replacement.  (Doc. 96-1 at 26.)  An EP consult request was submitted on January 30, 2018.  (Doc. 112 ¶ 20.)

Plaintiff had an EP evaluation at the AZ Heart Rhythm Center with Dr. Makkar on February 16, 2018, and Dr. Makkar recommended an AICD battery replacement. (Doc. 100 at 123–27.) This was the first time one of Plaintiff's treating specialists ordered a battery replacement. Defendant Ende submitted a consult request on February 24, 2018, and Plaintiff's AICD battery was replaced at Abrazo Arizona Heart Hospital by Dr. Makkar on March 12, 2018. (Doc. 96 ¶ 13; Doc. 112 ¶ 23; Doc. 112 at 159–60.)

The delay in Plaintiff's AICD battery being replaced did not amount to deliberate indifference where Plaintiff's treating specialists required additional testing—a chest x-ray and an echocardiogram—before referring Plaintiff for an EP evaluation. The Corizon medical staff had these tests performed. Once the additional tests were completed, Plaintiff's treating specialist referred Plaintiff for an EP evaluation, and the Corizon medical staff promptly took steps to have Plaintiff scheduled for this evaluation. Plaintiff's AICD battery was replaced within a month of Dr. Makkar recommending the replacement. Plaintiff has not presented any evidence that the delay in replacing his battery was due to deliberate indifference rather than the treating specialists' need for additional testing.

The record shows that Plaintiff received continuous medical care related to his heart condition. His complaints were consistently addressed, and there is no evidence that they were ignored or left untreated. Each time he presented at the clinic, he was seen by a nurse, referred to a provider, and in many cases sent to a specialist. Plaintiff has not presented any additional medical records that would dispute this finding or show that any aspect of his medical care was due to or resulted in a constitutional violation. Even if there were delays in treatment, Plaintiff points to no evidence that would show or create a genuine issue of material fact that he required more urgent treatment at those times or that he was harmed by the delays. Accordingly, the record does not support a finding that Plaintiff's constitutional rights were violated.

Moreover, even if there was a question of fact as to whether the Corizon medical staff was deliberately indifferent to Plaintiff's serious medical need, Plaintiff has not presented any evidence that Corizon promulgated a policy, practice, or custom that

deprived him of his constitutional rights. Because Plaintiff has not presented any evidence that his constitutional rights were violated pursuant to a policy, custom or practice established by Corizon or that a policy, custom or practice was the moving force behind the alleged violation of his rights, the Court will grant summary judgment to Corizon.

**V.    Defendant Barnett**

On June 12, 2018, service on Defendant Barnett was returned unexecuted. (Doc. 31.) The Process Receipt and Return indicates that attorney Scott Conlon "refused to accept service on Dr. Barnett's behalf" and that Conlon stated, "he is not allowed to accept process and Dr. Barnett may not even be his client." (*Id.*)

On July 3, 2018, the Court issued Plaintiff a subpoena duces tecum so that he could obtain Defendant Barnett's address from the Arizona Medical Board or another state's medical board. (Doc. 42 at 2.) The Court ordered Plaintiff to complete service within 70 days and warned Plaintiff that failure to complete service on Defendant Barnett could result in Defendant Barnett being dismissed from the action. (*Id.*)

Plaintiff completed and submitted the subpoena duces tecum on July 10, 2018, but he improperly addressed it to Corizon and not to a state medical board as ordered by the Court. (Doc. 53.) On August 13, 2018, the Court issued another subpoena duces tecum and again directed Plaintiff to address it to the Arizona Medical Board. (Doc. 55 at 2.)

Plaintiff completed and submitted a subpoena duces tecum addressed to the Arizona Medical Board on September 28, 2018, and it was served on October 5, 2018. (Doc. 69.) Counsel for the Arizona Medical Board filed Defendant Barnett's last known address under seal, and the service packet was forwarded to the U.S. Marshals Service (USMS) on October 25, 2018. Service at Defendant Barnett's last known address in Washington state was returned unexecuted on November 20, 2018. (Doc. 79.)

Plaintiff subsequently moved to serve Defendant Barnett by publication (Doc. 82), and the Court denied the motion. (Doc. 94.) To date, Defendant Barnett has not been served. The Court previously advised Plaintiff that although it directed the USMS to serve Defendant Barnett, Plaintiff is responsible for providing the proper address for Defendant

Barnett to effectuate service. (Doc. 94 at 2 (citing *Sweet v. Hernandez*, 2003 WL 21920921, at *8 (N.D. Cal. Aug. 6, 2003).) It is not the Court's or USMS's responsibility to track down the addresses of defendants. Plaintiff was previously warned that failure to timely serve Defendant Barnett could result in Defendant Barnett being dismissed from the action. (Doc. 42 at 2; *see* Doc. 15 at 10.) Accordingly, the Court will dismiss Defendant Barnett from the action without prejudice for failure to timely serve pursuant to Federal Rule of Civil Procedure 4(m).

## VI.    Motion for Preliminary Injunction

In his Motion for Preliminary Injunction, Plaintiff asks for his AICD to be replaced and "immediate follow up with Dr. Makkar's treatment plan of 6 month [follow-ups] and echocardiogram every 6 months, fresh fruit." (Doc. 114 at 2–3.) In addressing the Motions for Summary Judgment, the Court determined Plaintiff's constitutional rights were not violated. Therefore, Plaintiff has failed to show that he is likely to succeed on the merits of his Eighth Amendment claim or that he will be irreparably harmed if the requested relief is not granted, which are both requirements for obtaining injunctive relief. *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). Accordingly, Plaintiff's Motion for Preliminary Injunction will be denied. *See Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1174 (9th Cir. 2011).

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is withdrawn as to Defendant Coleman's Motion for Summary Judgment (Doc. 95), Plaintiff's Motion for Summary Judgment (Doc. 104), Corizon Defendants' Motion for Summary Judgment (Doc. 111), Plaintiff's Motion for Preliminary Injunction (Doc. 114), and (5) Plaintiff's Motion to Amend (Doc. 132).

(2)    Plaintiff's Motion to Amend (Doc. 132) is **denied**.

(3)    Defendant Coleman's Motion for Summary Judgment (Doc. 95) is **granted**, and Defendant Coleman is dismissed from the action with prejudice.

(4)    Plaintiff's Motion for Summary Judgment (Doc. 104) is **denied**.

(5)    Corizon Defendants' Motion for Summary Judgment (Doc. 111) is **granted**, and Defendants Corizon, Ende, Grabowski, Labar, Myers, Rogers, and Elijah are dismissed from the action with prejudice.

(6)    Plaintiff's Motion for Preliminary Injunction (Doc. 114) is **denied**.

(7)    Defendant Barnett is **dismissed** from the action without prejudice for failure to serve pursuant to Federal Rule of Civil Procedure 4(m).

(8)    The Clerk of Court must terminate this action and enter judgment accordingly.

Dated this 30th day of August, 2019.

David G. Campbell
Senior United States District Judge